# Deposition 1

## Dr. Victoria Hartmann Deposition

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID ELLIOT WERKING, an Indiana Resident,

Plaintiff,

vs.

Case No. 1:19-cv-276

HON. PAUL L. MALONEY

BETH EILEEN WERKING AND PAUL MICHAEL WERKING, Michigan Residents,

Defendants.
______________________________/

REMOTE ZOOM DEPOSITION OF

VICTORIA HARTMANN, Ph.D.

Taken on Thursday, January 28, 2021, commencing at 1:30 p.m., pursuant to Notice.

APPEARANCES:

FOR THE PLAINTIFF: POWERS & GREENGARD
Mr. Miles L. Greengard (P76812)
The Carriage House
509 Franklin Avenue
Grand Haven, Michigan 49417
PH: (616) 512-5474
mgreengard@powersgreengard.com

FOR THE DEFENDANTS: VANDERBROEK LAW PLLC
Ms. Anne M. VanderBroek (P81541)
17190 Van Wagoner Road
Spring Lake, Michigan 49456
PH: (616) 607-7522
anne@vanderbroeklaw.com

REPORTED BY: MS. ARLENE M. WRIGHT, CSR-34, RPR, FCRR
Licensed in MI, GA, and FL

TABLE OF CONTENTS

WITNESS: PAGE:

VICTORIA HARTMANN, Ph.D.

Examination by Ms. VanderBroek 3
Examination by Mr. Greengard 16

VICTORIA HARTMANN, Ph.D., DEPOSITION EXHIBITS

(Original exhibits were scanned and provided to both counsel, sealed with the original transcript.)

EXHIBIT: PAGE:

Exhibit 1 Document titled Receipts of Property 8
Document titled List of Missing Items
Exhibit 2 Hartmann Catalog - Erotic Film Collection 12
Hartmann Appraisal Report

(Whereupon, counsel stipulated to this reporter remotely administering the oath to the witness and remotely reporting this deposition.)

THE REPORTER: Dr. Hartmann, will you raise your right hand, please?

Do you solemnly swear or affirm that the testimony you will give in this cause will be the truth, the whole truth, and nothing but the truth under penalty of law?

THE WITNESS: I do.

THE REPORTER: I thank you.

EXAMINATION

BY MS. VANDERBROEK:

Q. Dr. Hartmann, welcome. Thank you for being here today. You are a doctor, correct?

A. **I hold a Doctor of Philosophy and a Doctor of Human** Sexuality.

Q. Okay, what was the training involved in getting those degrees?

A. **With regard to the DHS, which is the Doctor of Human** Sexuality, it was 60 hours of study of various human sexuality principles and practices including anthropology, biology, sexology, counseling, training, etc., and a DHS dissertation at the end of that which in this case was statistical.

Q. And what do you do with that degree?

A. **Well, I followed it up with a Ph.D. which is a slightly** different degree. The sexology degree is more of a, an applicable degree to providing counseling and sexological services, talk therapy, etc., and it's an adjunct to, say, a Masters in counseling or social work. The Ph.D. is more of an academic degree, and for that I did a dissertation on a phenomenology of users in online extreme pornography communities. And that is more used for academic pursuits, and that's what I base my current and ongoing academic pursuits on such as further research, writing journal articles, etc.

Q. And have you written a number of journal articles?

A. **I've written about five. One is under revision; the other** four are like it happens in academia, were rejected. That's the fun of writing journal papers. You get many, many years to refine your work.

Q. And what do you do for a living?

A. **I'm the executive director of the Erotica Heritage Museum in** Las Vegas.

Q. And what do you do in that position?

A. **I'm the administrator of all of the operations of the museum;** so I not only handle budgeting, I oversee the curating staff, the valuations of the curating staff, the implementation of exhibits, um, marketing, events. So I have oversight of all of the operations of the museum.

My primary function, though, is budgeting and more administrative oversight.

Q. And do you have any particular experience in any of the different areas that you mentioned?

A. **I centered my academic work on examining the nature of pornography, its effects on people and the market of pornography.**

Q. By "market," you mean?

A. **The business, the business of pornography, I am sorry. Let me clarify.**

Q. And you mention you oversee the valuations. Do you do valuations or do you hire an expert to come in and do valuations?

A. **It depends on what the collection is. For instance, if it's a collection that the museum is going to acquire, we generally do those valuations in-house and I have various people that assist with that. My curating supervisor, she has more of an expertise in literary and arts valuations. She's pursuing her Masters degree in Library Sciences and so that's where her expertise comes in. I generally do the pornography simply because that's my area of expertise.**

**If there's a piece of art or artifact that's outside the scope of what we are able to valuate, then we'll bring in an expert. The issue there is that in terms of erotic art, pornography, etc., there are limited folks who have expertise in that simply because it's a field that's looked down upon by most valuations societies.**

Q. Have you done any additional work in valuations outside of your work in the Erotica Museum?

A. **Beyond what I did in my doctoral work, no.**

Q. No T.V. shows or anything like that that --

A. **Oh, have I done media, yes. I've done media talking about pornography, the market of pornography, how it affects people for -- my most recent article was just last week, was it last week? For GQ Magazine with regard to the Armie Hammer situation in Hollywood. I was asked by GQ Magazine to comment on extreme pornography. And I've also done articles for Las Vegas Weekly, you know, review journals, to interviews by Comedy Central, John Stuart Show, etc., so I've done several appearances both radio and television, yes.**

Q. And you were asked to value this particular set of items, correct?

A. **Correct.**

Q. You were paid for that service?

A. **That is correct.**

Q. Were you paid to render any particular opinion?

A. **No. I was paid to render an opinion but not any opinion in any particular direction, no.**

Q. You were given a list of items, correct?

A. **That is correct.**

Q. Those items would be what we are showing as, let me see if I can share my screen. You should be seeing an Adobe list. Does this appear to be the list you were given?

A. **That is correct.**

Q. And this would be the other part of that list. Based on that list, did you have sufficient facts to be able to value the items?

A. **In most cases, yes.**

Q. And when you are valuing is there a set of principles or methods that you use to value the items?

A. **Yes, however, my screen froze so I can't access that.**

Q. There it goes.

A. **Okay, here. Here we go. Could you restate the question, please? I got lost in the freeze of the screen.**

Q. Yes. When you are valuing something is there a set of principles or methods that you use to value those items?

A. **Yes, so what I, the approach that I used was fair market value valuation, and what that is defined as is the price at which property changes hands between a willing buyer and a willing seller and both the buyer and seller having reasonable knowledge in facts.**

**And the approach that I use, there are three commonly used appraisal processes to determine value: The cost approach value includes either reproduction or replacement cost of the property, either new or depreciated.**

**And how that is applied is if the individual has to recreate the material through another production or assembling the same folks together to film that, or an artist, or so forth.**

**The second one was income approach to value, which is the individual who is in possession of this material going to make money from it. In other words, is there an anticipated future benefit of income.**

**And then the market comparison approach to value is what are the materials currently available for, valued at, etc. And that was the approach that I utilized was the market comparison.**

(At 1:36 p.m., Hartmann, Ph.D., Deposition Exhibit No. 1 was marked.)

Q. And there was sufficient information in that exhibit which we're marking as Defense Hartmann Depo Exhibit 1 to apply those principles and methods to that item list?

A. **In most cases there is a list on Exhibit B, I believe it's Exhibit B, the spreadsheet. There were some titles that we were unable to determine. I would say a good 85 to 90 percent we were able to determine or make an assessment on comparable values in the marketplace, yes.**

Q. Is this the, I don't know if you can see the Excel spreadsheet. Is this the spreadsheet you were talking about?

A. **That is not the spreadsheet that's on my screen. I'm seeing the report.**

I now have the Excel sheet pulled up. Yeah. That's the one.
Q. And this was generated as part of the report that you created, correct?
MR. GREENGARD: My internet cut out, so the last thing I heard was introducing what I believe you've marked as Exhibits 1 and 2. Those were 5 and 6 of the original Complaint so I was hoping we could get a quick rundown of the past 45 seconds or so that I missed.
MS. VANDERBROEK: Those two exhibits, I'm combining those into one exhibit.
MR. GREENGARD: And then what else happened.
MS. VANDERBROEK: I had Dr. Hartmann explain whether, what the principles and methods are for valuation and whether the list and whether Defense Hartmann Depo Exhibit 1 was sufficient for her to be able to apply those principles and methods to that list. She said she generated a report based on that and a spreadsheet. This is the spreadsheet she created. She just verified that and that she created a report that went along with that and I'm now ready to talk about that report.
MR. GREENGARD: I ask that you re-ask the principles and methods question just so that I don't have to do it when we're done so I can hear the answer.
MS. VANDERBROEK: Okay.

MR. GREENGARD: I apologize. I switched to a different network so hopefully that won't happen again.
MS. VANDERBROEK: Okay, so let me back up then.
BY MS. VANDERBROEK:
Q. Dr. Hartmann, you were given a list of items that we are marking Defense Hartmann Deposition Exhibit 1. These are that list, correct?
A. **Correct.**
Q. And from that, when you value something do you use any particular principles or methods by which you value those items?
A. **In this case I used the appraisal based on fair market value.** The definition of that is the price when property changes hands between a willing buyer, a willing seller, neither having to buy or sell, both having reasonable knowledge to relevant facts.
There are three approaches that can be used toward valuing items of this nature of personal property:
One is the cost approach value, which includes either reproduction or replacement cost of property and that applies to whether or not the individual, in this case the plaintiff, would have to reproduce the material through either a new production, hiring the performers, or otherwise having to replace it through the production of the item itself.

The income approach to value is another option that can be used which is whether or not the individual, in this case the plaintiff, would be able to generate income or revenue from the material such as if he was a production house that was producing that materials. That didn't apply here either.
And then the market comparison approach to value, which estimates the value by comparison with properties in the relevant market, and that was the approach that I chose to utilize in this particular valuation.
Q. And the lists that were provided to you give you sufficient facts to apply those principles and methods to that list?
A. **In most cases, yes. There were of course some titles I was** unable to determine, but I would say 85 to 90 percent of the materials that were listed I was able to determine the value of.
Q. And did you generate a report showing that valuation?
A. **I did in the form of a spreadsheet which was then summarized** in the valuation report -- the appraisal report, I am sorry. The appraisal report.
Q. And is this the spreadsheet that you generated?
A. **That's correct.**
Q. And does this appear to be the report that you generated?
A. **That is the appraisal report, yes.**
MS. VANDERBROEK: If we could mark those two items

together as Defense Hartmann Deposition Exhibit 2.
(At 1:42 p.m., Hartmann, Ph.D., Deposition Exhibit No. 2 was marked.)
Q. What valuation total did you come to?
A. **One moment. The total appraisal came to $15,446.06.**
Q. And what assumptions were made in coming to that number?
A. **There were -- well, one moment.**
Q. I guess let me clarify. Did you assume that they were originals or of a certain media format or purchased versus copied, etc.?
A. **I based the appraisal on the assumptions that the materials** had been purchased originally by the claimant -- I am sorry, the plaintiff, that they were largely purchased in either VHS or disc format at the time of production or close to the time of production and that they were purchased in either an online or an in-person store. In-person purchase.
Q. Would the values be different if the items were purchased off the internet streaming as a streaming format and then later burned to disc versus originally being sold in disc or VHS format?
A. **Considering the timeline of the purchases, streaming was much** less available in the marketplace at the time. So when it was available, I defaulted to a disc form or a DVD form, as VHS is largely unavailable in the marketplace these days and streaming is much more common.

However, at the time that these items were purchased, streaming was less common and thus I defaulted to a tangible, physical item first and then if those weren't available I went to streaming.

Q. And you said at the time purchased. What did you assume for the time purchased? Did you assume it was purchased in the last 10 years, 15 years, two years?

A. **Considering that most of the items were purchased in a** tangible, physical format, roughly in the last 15 to 20 years.

Q. Would the valuation be different if they were copied or reproduced as opposed to being in an original format?

A. **Can you state the question again, please?**

Q. Would the valuation amounts be different if the content were copied or reproduced rather than the original purchase format? For example --

A. **How do you -- the way I'm understanding the question is** you're implying that the material could have been downloaded illegally and copied to a disc?

Q. Potentially, or borrowed from a friend and copied or from a library and copied sort of thing.

A. **That was not considered in the valuation.**

Q. Would that change that valuation if it had been considered?

A. **Yes, because then there wouldn't have been any out-of-pocket** costs to replace.

Q. So the number would have been lower then rather than higher, or higher rather than lower?

A. **Lower rather than higher.**

Q. Alright, you mentioned some items were unable to be valued. Why?

A. **Either they were, despite our best efforts to find them, they** were completely unavailable, not found on any database or on any kind of resource website, or their titles were too vague and could not be even located down to say a production house.

And that was one of the methods that I used was going to production houses and seeing if there were similar titles of that nature. Or they were outside of the scope of the valuation simply because they either were custom, appeared to be custom materials that might have been commissioned, at least the title could imply that, or they were materials that were simply outside of my scope of valuation such as You Can't Get Enough Dog.

Q. Let me unpack that a little. When you say custom video or custom commission, what do you mean by that?

A. **So there's a difference in -- I can't scroll this document** that is up on my screen. There are four different types of materials, or five I should say. Let me restate that.

There are five different kinds of materials. There are mainstream materials which are commonly found in the marketplace. They are done by well known or semi well known

production companies, and those are generally the ones that can be valued or appraised the easiest because they either are still on the market, can be found in terms of similar titles or they have a mainstream sexual content that can be found. Niche materials are a little bit harder to find. They have aspects of paraphilic behaviorism such as urination, feces, etc.

But considering that fetishized materials can also be found on the marketplace nowadays a little bit easier, those are still within the realm of valuing or appraising with relative ease.

Custom materials are materials where say the plaintiff contacted a model that could be contacted on social media or in, you know, by mail or usually by e-mail and in that case through a website. They then negotiate that custom material. So the model will say "Okay, for this particular one-of-a-kind film that I am going to do for you where I'm dressed a certain way or I perform a certain act, I charge this much." And then there is a negotiation between the purchaser and the model to produce that material, so that's what's defined as custom material.

Q. And when you talk about something outside of the scope of your valuation or expertise, what kind of things are you talking about there?

A. **Titles that appear to be, the titles that appear to be -- I'm**

looking at the titles here. Titles that have words in them such as Animal Variety, Ultimate Horse, Can't Get Enough Dog. While those materials are not films that could be depicting animals in sexual activities, they are not defined prohibited forms of speech, but I'm not, I don't have any experience in valuing materials of those nature, so it's just outside the scope of what I was able to do in this particular valuation. I don't have the expertise to value those materials.

MS. VANDERBROEK: Okay. Thank you. I think that's all my questions.

MR. GREENGARD: Dr. Hartmann, I have a few questions for you and we'll get you on your way.

EXAMINATION

BY MR. GREENGARD:

Q. You said extreme pornographic communities is where you have your expertise. The adjective "extreme," does that mean by fetish, or is it, does it mean something else? And, if so, what does it mean?

A. **That's a very good question.**

Q. Thank you.

A. **What I mean by extreme are those types of paraphilias, at** least in my expertise, that pertain to things like necrophilia and the various sub-types of necrophilia fetishes, so that's what I mean by "extreme." Those would be probably the most extreme. Other than child pornography,

necrophilic pornography is considered the same.

Q. So fetishes for senior citizens, or bondage, or things like that, that would not be defined as extreme?

A. **No.**

Q. And I want to circle back to the last question. You stated that given some of the titles, it was possible that some of the destroyed property could have depicted animals, correct?

A. **Based on the titles, could have. I can't verify that since I** haven't seen the title.

Q. But it could be something like Reservoir Dogs, that's not actually about dogs at all. Is that fair?

A. **I would say that's reaching simply because when we are** talking about these titles in a sexual context, in a pornographic collection it's more likely that they depict animals or include an animal. And I want to make sure that I clarify that and that I'm implicit in that that I stated in my report depicting animals in sexual activity, it doesn't mean that it could depict the animals are engaged in sexual activity, just that there is sexual activity and seemingly from the title, animals could be in the film. I don't have, I didn't see the titles. I can't verify that sexual activity was done with the animals or not.

Q. So it would be possible that for Can't Get Enough Dogs that it's two consenting adults with a golden retriever in the background?

A. **That's possible.**

Q. Okay, you stated that there is a field of customer commission property, is that correct?

A. **That's correct.**

Q. What's the price range on those.

A. **It varies widely, simply because each performer has, you** know, much like sex work, a performer could do a title, perform a title for a longtime customer that's at a deep discount because they know they are going to have future work. So a custom production could be 30- to $50 for something short like smoking and could be 3- or $400 for eight, 10 hours of performing, you know, explicit sex acts. So it varies by performer to performer, act to act, and film to film. It's very difficult to determine what an average range is because there really isn't one.

Q. That's fair. What's the most you've ever heard of on a commission piece?

A. **The most I've heard of -- well, okay, that's another question** with a lot of variables. If you're talking about, I'm trying to think of her name. There's a Disney performer who has now gone into, Annabella, I am sorry, I can't think of her name right at the moment. She does, she charges $30 for her "Gamer Girl" bath water. And she makes $1.2 million a month on Only Fans doing non-hardcore, implied nudity-type stuff.

So I don't know that there is a top range or a bottom range because it also depends on how well the performer is known, if she's a cross-over celebrity say like the Kardashians? I don't know what that top limit is simply because of the nature of the industry and the fact that large or big celebrities that have mainstream appeal are now in the pornography industry.

Q. Is there a general trend line towards commission pieces being more expensive for the more niche field that it is?

A. **It depends on the niche field. It also depends on whether or** not that field has mainstreamed itself. You know, in the case of, let's say, let's go back to materials that depict horror types of themes. They used to cost 3- to $5,000 for a custom film and they can be gotten now for 50. So it depends on the individual niche, whether or not it's gone mainstream.

As you see in pornography with incest materials, those have gone completely mainstream and can be gotten for a dollar 99. So it depends on the niche, its popularity, the timing of when it's done, and the performer that's doing it. It's very difficult to determine value in these cases because the goal posts continue to move.

Q. You stated that most of the replacement values were disc just because VHS is relatively uncommon. Is that a fair characterization?

A. **Let me, let me clarify that. I stated that I defaulted to** disc when it was available simply because VHS is less and

less available. I don't think we even found a VHS in the search.

Q. Would a VHS, the same title, would a VHS given its rarity potentially have more value in the way that some vinyl albums are worth more on the original vinyl than a CD?

A. **That's another good question. I haven't seen evidence of** that. VHS, unlike vinyl, doesn't have a nostalgia perspective to it insofar as vinyl does. Vinyl has gone to sort of this type of hip collector type of perspective or people collecting them consider them hip and radical, and so forth. I haven't, not to my knowledge has VHS taken on that kind of social appreciation. They are seen as antiquated. And especially because tape deteriorates over time, if anyone was utilizing VHS or kept their VHS, it's more likely they would have converted those or tried to transfer those when you could do that and still have the machinery or the companies that would transfer VHS to disc. I don't know that it has the same kind of appeal long term simply because of the nature of its deterioration.

Q. Are there, so first pressing, the books have, have more value. First editions have more value. Within the pornographic community is there that type of delineation? Let me rephrase it. Can there be that type of delineation?

A. **There can be if the performers are well known enough, say,** like Jenna Jameson when she was at the height of her success

and they were signed by the individual performers that were famous at the time.

Q. So like anything: If the artist signs it, it sky rockets in value.

A. **Yes. Even in pornography, yeah.**

Q. But the same title that the 1990 VHS versus a 2005 DVD, there shouldn't be no difference in value, all things being equal.

A. **It depends on, so when VHS was first coming out, especially** as it was in the era that it was most consumed, the production companies in the mainstream productions when they would sell these titles for 5- to $10 because they were mass produced and the stores would mark them up to between 50 and $75. So the markup on the part of the retail companies was very high. That started to diminish even in spite of DVD releases simply because the streaming world became more and more common and consumers could find material online for, you know, a dollar 99 a minute. Or, or, you know, 12.99, whereas they would pay a much higher rate in the store.

So I would have to say that the VHS at the time would cost more simply because of the way the market was and I don't know that the DVDs would be as, they would cost as much simply because of the rise of online streaming. Are there exceptions to that? Possibly. But I think the nature of the online streaming diminished even DVD sales.

Q. Were any of your replacement values based on streaming and

not physical media?

A. **When we were, when I wasn't able to find a tangible, physical** item to replace a title with, I defaulted to the next available streaming product which I took it it was, you know, say if I could find a DVD for 1999 and I found the same film for streaming for 14.99 or 12.99, I would default to that.

Q. You would default to the streaming in situations where you found both the DVD and the streaming, correct?

A. **No, when I couldn't find the DVD.**

Q. Okay, so your process of valuation, it would be DVD, then streaming, then VHS?

A. **VHS wasn't found.**

Q. Okay, so if not DVD, then streaming. If not streaming, a zero dollar value. Is that fair?

A. **Not in all cases, no.**

Q. In what cases would it be different and why.

A. **Well, if you look at the Excel sheet and at the report, there** were titles that, let's see. One moment. Let me find an example. I am sorry, my dog is whining in the background. I apologize.

Q. We're not hearing it so no need to apologize.

A. **There were titles where the, the item itself was found. In** other words, the title. So Sisters, uh, uh, let me go here. Find the... On the sheet, K8210.85, No. 106 in line, lane, line, lane, sorry, 498.

Q. You are a going a little bit fast. I want to get a chance to scroll there. This would be 106, Sisters, zane, 1993?

A. **That's correct.**

Q. Okay.

A. **So while the title itself was found to have existed, it was** discontinued and, therefore, I applied the average value that I cited in the report as $36 because I could find the title; it simply wasn't available anymore but it had value because, in my opinion, it was still able to be appraised simply because it was still noted online as having been in production and having been previously available.

Q. So this would be, if we are going to use Sisters as an example, this was shot and the company either went out of business or burnt down, or whatever, and all of the original copies were lost and it's functionally a lost film. Is that fair?

A. **Yeah, um-hum.**

Q. So those were given a default of $36. Correct?

A. **When they could be found, they are given an average of $36 in** value, yes.

Q. Now do you have an example where you were unable to find the DVD but you were able to find streaming prices?

A. **Let me look. I really am sorry.**

Q. No, no, you're doing great.

A. **She's just like trying to take the door down here.**

Q. We can take a break if she needs to go outside or --.

A. **No, she was just out. So if you look at Taboo 12. Line 387.** No. 7, Taboo 12.

Q. I've got that.

A. **Okay. So in this case, we couldn't find the DVD and** therefore, we used the price that was available at the time. Now like I said at the top of this, that market fluctuations, anything can change, right? I lost my place.

Q. 387.

A. **Yeah, 387. That we defaulted to the streaming price which** was available at that time which was $4.88.

Q. Does the streaming price change based on search popularity, or every time someone buys it, it goes up like the stock market? Or is streaming price relatively static?

A. **Streaming prices flux.**

Q. Based upon what?

A. **In this particular case, the market will charge more for more** popular downloads and charge less for less popular downloads, so they are more attractive to consumers with an older title on them.

Q. If we look at 387 as just an example, we have it at 4.88 but the film is almost 20 years old. Is that price likely to change or if we log on today it might be an $8.00 download instead of $4.00?

A. **I think the change would be small. For instance, you know, I**

listed 4.88. It's being listed at $5.00 and then another source it's $8.00 so I think the change, if it would occur, would probably be minimal.

Q. Okay, and do you know how many streaming titles, not DVD titles were valued out of the approximately 900 titles, closer to 850 titles that you listed?

A. **I don't have that number off the top of my head.**

Q. Would that be easy to find or would that be 15 minutes of us all looking at our watches?

A. **I think it would be longer than 15 minutes, yeah. Probably a** couple of hours.

Q. Is it going to be easy for you to do or is it going through and you counting and tallying.

A. **(No response).**

Q. Did my question go through or am I muted?

MS. VANDERBROEK: Are you asking me a question?

Q. No, I'm sorry, Dr. Hartmann, would that be an easy total to come up with or would that be exhausting to come up with.

A. **I'd have to spend at least a couple of hours going back to** the database and reviewing the links to make sure that, you know, I could do an accounting of DVD versus streaming.

Q. Can you give a ballpark? Is it, you know, one, ten, a hundred, just a ballpark. And no one is going to hold you to that number.

A. **I don't even have a ballpark, I apologize.**

Q. The streaming titles were these closer to clips or were these closer to film length?

A. **It appeared as though they were closer to film length so they** were making that available by film. If you see a clip, that's usually in the $1.99 range. But if you see a film, that can change anywhere from 5 to $15.00.

Q. So there would be a significant amount of band width to replace all of these films that were streaming to download them?

A. **How are you defining band width?**

Q. The actual person logging onto the computer going to, you know, what I'm looking at 397 -- I've lost it. But, you know, going to adultfilmcentral.com and downloading a clip, it's going to use a significant amount of a person's internet to download a bunch of these films. Is that fair?

A. **I think it depends on the type of internet connection they** have. If they use it on their phone, they will use up their data. But if they are on an internet range package of 50- to $70 a month, I don't know that it would constitute a high amount of band width within those types of packages because cable companies don't really charge by band width anymore. They charge by, you know, how open your pipe is or not.

So, like I said, I'm troubled with the language because a lot of companies don't charge by band width insomuch as they do in the openness of the pipe that you're

buying. You're either buying T1 or you're buying something you do social media with and it costs you $24.95 a month with cable.

Q. Well, let me rephrase it then: Given the speed of the download, what would be the approximate film size of a 75-minute film?

A. **Depends on the compression rate. If you have, you know,** something that's 1040P or 4K, the size is gonna be much larger than if you have something that's compressed down to say, you know, 256 or a, you know, something that's other than 16 by 9. It really depends on the compression rate of the video so I, I can't really assess. It would, like I said, it depends on in what format the video is being downloaded. 4K? Or old school on the average low resolution website.

Q. Let me try asking this question a different way. Dr. Hartmann, I think you and I are approximately the same age, so --

A. **No, I think you're much younger than I am. I'm 51.**

Q. Well, that is a most surprising answer. I had you in your mid to late 30's. This experience will be even more appreciated by you. You must remember in the early days, the days of the mid to late '90s taking overnight to download a four-minute MP3 and now it takes about two seconds to download a four-minute MP3.

Based on your expertise and having gone through this list which I haven't and I doubt Ms. VanderBroek has clicked on each one of these links, how long would each of these videos take? Would it be something that on an average person's internet connection they are able to download the film in a few minutes or am I going to be running my computer for weeks downloading all of these films?

A. **I would, and me not being a network, an IT person, I want to** preface it with that not being an IT person, I'm hesitant to even give a kind of a ballpark because I don't really know. An hour long video, well, let me use regular video as an example. If you're streaming something, it's instantaneous so you click on the link and it plays. If you are downloading it, depending on your internet connection, depending on the server that it's on, it can take five minutes or it can take an hour. There's a lot of variables here.

Q. Okay, if you click on any of these so I'm looking at line 852, Pyromaniac. It's discontinued, but I'll just use that as an example. If I click through that and it was a streaming one, is it going to say this is a 5 gigabyte file? Or is that not information that's generally contained within the block of text about the film?

A. **Right. That's also a good question. It depends on the** website. On websites that are geared towards download, which

less and less sites are because of copyright issues, they will have a list or they will have probably some kind of listing of the, the size of the file. Streaming sites are less likely to do that simply because they have, you know, methods in place to prevent download because of copyright issues and, you know, things of that nature. So it depends on the website.

Q. So it sounds like most of the titles for which you were unable to find DVD prices, they would be of the streaming versus the download a clip variety. Is that fair? If I understand the, the difference?

A. **Well, let me go to one and find out.**

Q. I'm not trying to get lost in the details. I'll let you know where I'm going as soon as you answer this question.

A. **I would say the more expensive the title or the higher the** appraisal, the more likely it's downloadable; the lower the cost the more likely it is streaming.

Q. And if it's streaming, it's only available to be viewed on the computer versus if the plaintiff had purchased it on VHS or DVD where he could pop it into any T.V. that's set up for that format to play. Is that correct?

A. **Well, that depends on if he has some kind of like a computer** program, say as an example, Wondershare UniConverter, you can put, and others of that nature, you can put the URL into converters of that nature and download materials that are

streaming. I'm not saying that's, you know, a fast way to do it but you can do that. Or people have sometimes done that where they can download it through a converter.

Q. And then the downloading eventually to replicate it to -- strike that. Let me rephrase and start over.

Theoretically, if the plaintiff purchased a title Film X on DVD and it was lost and you were unable to find a DVD replacement but you were able to find a digital, there would be additional costs after downloading the film to put it back into that original state with in terms of burning it onto a DVD. Is that correct?

A. **Well, it seems to me that you would have to pay for a** converter once so I don't know that that would be considered ongoing costs. It would be one cost for all in that sense because you buy the program once and they average $50 and then if you wanted to burn onto another DVD or disc, then it would be the cost of the discs which I don't know what they cost. Maybe a dollar apiece, $.50 apiece? I don't know.

Q. So it would be fair to say there are marginal additional costs to convert the digital copies into a physical media copy. Is that correct?

A. **I'd say minimal cost.**

Q. Is there value in the box art or the physical storage device within the pornographic community?

A. **Considering that a lot of that box art isn't available online**

with the type of vendors that sell this material, again I come back to if it's signed by a particular famous performer at the time, it has value. But because it's available in digital format along with the video itself, not likely.

Q. Okay. I asked this question about the number of streaming and you said it would be a little bit of leg work; do you know how many were given the value of $36?

A. **Off the top of my head, I don't have that number.**

Q. Okay. Was it a lot or -- I am sorry, I didn't hear what you said; we talked over each other.

A. **I said -- I lost my place here again. Spreadsheets and I** aren't good friends. I don't think there were too many. It wasn't a significant amount. There are a few but it wasn't significant.

Q. But it's entirely possible that the clips for which you know it existed but were lost, the $36 placeholder value could be significantly lower than the actual market rate, given the limited supply.

A. **Well, that's, you know, largely why I took an average of I** think nine or 10 of the most common prices.

Q. Are there the, the VHS -- strike that. Let me try again.

The DVDs that were produced by the porn industry, did those have protections against copies on them the way that if I bought a DVD today that I couldn't just stick it into a DVD burner because there's protections on it?

A. **I would have to say that depends on who's producing the** material. If you have someone that's a smaller player, they might not have had the resources to put some kind of copyright protections on them. Some of the bigger players may have, so I think that's variable.

Q. In your experience with the production companies on plaintiff's lists, were those smaller, larger, or spread throughout?

A. **They seemed spread throughout. Predominantly, well, they** seemed spread throughout because at the time you had three big players which were Wicked, Vivid, and Caballero; then you had smaller ones, VCA, and so forth. So it varied.

Q. And I'm almost positive --

A. **And not to interrupt, but I, I don't have the kind of** background in really knowing when copyright protections were placed on DVDs, so I don't have expertise in that area.

Q. I am referencing what has previously been marked as Hartmann Exhibit 1. This is also Plaintiff's Motion in Opposition to the Summary Judgment, Exhibits 5 and 6, of which one was called Receipts of Property and one was called List of Missing Items. Do you have those, Dr. Hartmann, or do you want me to share my screen with you?

A. **I have them. Let me go back to that file. Okay.**

Q. I'm just scrolling through. It looks like there was about 1500 titles between the two, on each of the two exhibits or

on each of the two separate .pdf's that we've combined for purposes of this deposition to one. Correct?
A. **It appeared to be that way initially, yes.**
Q. And are those 1500 titles, are they the same between the two lists?
A. **They were duplicates.**
Q. Were they mostly duplicative or were there just a handful of duplicates?
A. **Upon inspection, it seemed as though they were mostly** duplicates.
Q. Okay, so we can use, so we can say so there were at least 1500 unique titles.
A. **I think we came up with the total of 600, let's see, 700,** seemed to be 700, roughly 750 because of the duplicate nature of the two documents.
Q. So I'm looking at page 2 of what I had marked as Exhibit 5 and that starts with Item No. 1591, Awesome Assets, (1987 4 play), which plaintiff had marked at $18. Are you looking at that?
A. **Yup.**
Q. So if we scroll down a few, he has Bible Black, disc 1; Bible Black, disc 2; Bible Black, disc 3. Now I know you weren't able to find Bible Black but I'll use it as an example.
He has it list ed as three separate items, but when you did the valuation those would be one item, correct?

A. **No, those were three so I listed them individually and Black** Bible, Bible Black were each valued separately.
Q. Then I'm confused how we went from 1500 in each of these two lists to the 750 on your spreadsheet. It seems like we lost 750 titles somewhere.
A. **It seems upon inspection that the items that bear Exhibit 5** was the list of items. And Exhibit 6 were what was, whether or not it had a receipt, but they were the same.
Q. But there's still -- on either Exhibit 5 or Exhibit 6 there's about 1500 items, correct?
A. **According to the accounting, we listed, I listed them all and** there were 750.
Q. I'm not doubting your numbers; I'm just scrolling through and I'm confused because as I look through Exhibit 6, I'm scrolling down and I see 1 through 1500 -- 1 through 1605, and I guess I'm just looking for an example of, and if you have one, that's great and if not, so be it, where you condensed multiple items on the Plaintiff's submitted list onto one item on the valuation sheet.
A. **We listed what, I listed what was on Exhibit 5.**
Q. Okay.
MS. VANDERBROEK: If I could interject? Miles, if you are looking at the first page of what you marked as Exhibit 5? So 1591 and then 1519. And then there is some in the 1500's. And then it skips 1400's entirely and goes to

1355. And then it does a few of the 1300's and then it goes to the 1200's. So it's not a, the numerical list is not a sequential numerical list.
BY MR. GREENGARD:
Q. So as I scroll through Exhibit 5, I don't see anything listed in the 1100's and I'm scrolling through it a handful of times now making sure I'm not going to have to eat my words on this. I see 1000; I see 1300, and I see 1500.
So if I scroll into the 1100's on Exhibit 6, I'm at the bottom of Page 31 of Exhibit 6:
1209: Over the Counter.
1208: Oriental Blue.
1207: My Play Thing.
1206: Girls Craving Girls.
None of those four were on your valuation sheet. Is that correct, Dr. Hartmann?
A. **I would have to look at the valuation sheet. I went by** Exhibit 5.
Q. And why didn't you look at Exhibit 6?
A. **Well, we did look at Exhibit 6 and it seems as though they** were duplicates and so it wasn't referenced.
Q. So I just took Girls Craving Girls as an example, and I searched for it in the catalogue and I'm not finding it. But, you know, I didn't build this so it's entirely possible that I'm wrong but...

A. **I would have to go through the list again and see if I can** find it. I'm not, I'm not, spreadsheets are a challenge for me, so I'd have to, you know, I can list stuff but searching is a little bit difficult so I would have to scroll through and do that.
Q. Okay.
A. **And because they are not listed in, in alphabetical order, it** would take a little bit of time.
Q. One second. How long did it take you to actually find all of these titles?
A. **About 50 hours.**
Q. Five zero.
A. **Um-hum.**
Q. And, and do you think it would take a committed user of pornography approximately that long to go through and find all these titles again and download it and restock the collection?
A. **It would depend on the devotion of the individual who was** going to download them. If they could devote all their time to it, possibly, but I don't know.
Q. Okay, and the, did your prices include shipping costs for the physical media?
A. **It did not.**
Q. And what's the shipping cost if, if someone were to go out and buy, you know, one of these DVDs? Is this something like

as seen on T.V. where they really get you on the shipping or is it going to be closer to Amazon where it's, you know, $2.00 or whatever?

A. **It depends on the vendor; I would say that they could offer** anything from free shipping, to whatever ZIP code they are shipping it to they would charge based on USPS or even UPS fees. Depends on the vendor.

Q. So shipping could significantly add to the price of replacing the collection?

A. **For shipping? Possibly.**

Q. Okay. Are the, is this, is the, to harp on the shipping, is this similar to an Amazon experience where if I buy a book, a movie, and a set of copper plates it's all coming from one Amazon warehouse and it's all gonna come in one box, or is it more similar to E-Bay where if I'm buying three items it's coming from three separate places so I might have to pay shipping on each of those three items rather than, than one boxful of items? Does that make sense or shall I can rephrase it?

A. **It makes sense. It makes sense. The logistics of shipping** with respect to vendors of pornography or online marketplaces, I don't have experience in the logistics. I can tell you what it used to be back in the '90s but that wouldn't be applicable here.

Q. So when you were going through and spending your time

compiling this list, you didn't see something that it's like, you know, buy as many DVDs as you want and pay one flat rate shipping, or it's like pay plus $4.99 for shipping and handling for each of these DVDs. You just have no knowledge either way.

A. **It wasn't something I was looking at.**

Q. Okay. That's fair. Are the physical media, are those used or are they new?

A. **I don't know the logistics of the companies. I would assume** that they got like a parcel or a pallet of printed or recorded materials that came from the distributor or the production house if the production house is still distributing it. They buy them in bulk basically.

Q. Does pornography have a, is, is it like a car where it doesn't matter if you've driven it one mile, it plummets in value once it's been used? Or regardless whether it's new or used, does it hold relatively the same value?

A. **It plummets. Unless it has something unique to it such as a** particular performer, or signature, or what have you, anything that makes it stand out significantly. But generally, it plummets.

A caveat to that if, like I said before in my testimony, if it's a popular download, sometimes the online distributors will increase the price because it's more popular. The market flux is based on demand.

Q. I have one standard question that I want to circle back to. What other cases have you served as an expert on or you've tried other pieces of litigation that you have provided your expert opinion on?

A. **I have not.**

Q. So I want to look at exhibit -- I'm just going to call it Exhibit 5 and Exhibit 6 so everyone has a clear reference. And Exhibit 5 was the, it's titled Receipts of Property and it has values of or suggested values or alleged values of the property.

And then Exhibit 6 is a list of items that plaintiff claims are missing. Would you agree that that's a fair characterization of the two lists?

A. **Are you asking me?**

Q. Yes.

A. **Okay, as I understood the exhibits to be that Exhibit 5 was** the complete list of the exhibits. And the List of Missing Items defined whether or not there were receipts for those items based on the definition of P-R-O-O-F-L-L or the lack thereof.

Q. So if something on Exhibit 6 said, you know, that the title, you know, Girls Gone Wild and then it said "Proof but no receipt," you would not have valued that, correct?

A. **Exhibit 6 was, as I understood it, was either had receipts or** didn't. So I based my valuation on, on Exhibit 5.

Q. So if something didn't have a receipt, you wouldn't have valued it, correct?

A. **I would have valued it, yes.**

Q. If it did not have a receipt.

A. **Yes. I would have valued it.**

Q. And what if it did have a receipt?

A. **I would also have valued it. The methodology would have** remained the same. Any of the titles, whether they had receipts or not because there were some prices that were listed or assumed on the part of the Plaintiff, I would valuate the list regardless of whether or not it had a receipt.

Q. So if something is -- when would you not have valued something that was in Exhibit 6?

A. **Well, like I said, Exhibit 6 appeared to be a duplicate list** so I based my appraisal on Exhibit 5.

Q. So if something was in Exhibit 6, it should have been valued. Is that a fair assessment?

A. **If it wasn't a duplicate, that's correct.**

Q. Okay. So if you bring up Exhibit 6, and I am going to share my screen so that we can all see what I'm looking at.

Theoretically, I did this correctly, I'm on Exhibit 6 and I'm at the end of the 1100's. I'm at the beginning of the 1200's. Can you see that, Dr. Hartmann?

A. **I'm scrolling. One moment. You're where now?**

Q. I'm on Page 31 of Exhibit 6. I also have it on my screen. Anne, are you there, too, so I can proceed?

MS. VANDERBROEK: I'm here.

BY MR. GREENGARD:

Q. You see where it says Screw My Husband Please, 1 through 5. We would all agree that that's there?

A. **What number is that?**

Q. 1199 through 1203 that's on Exhibit 6, page 31.

A. **1199. Okay.**

Q. Do we all see that? So Screw My Husband Please, 1 through 5, those should have been valued if they were on Exhibit 5. Correct?

A. **That's correct.**

Q. And what if they weren't on Exhibit 5? They wouldn't have been valued. Is that correct?

A. **They would not be in this list, no.**

Q. And they would have value, correct?

A. **That's correct.**

Q. Okay. So if Screw My Husband Please, 1 through 5, are not on this Exhibit 5, they're not going to be on your valuation sheet. Correct?

A. **That's correct.**

Q. Okay. So when I hit Control F and I searched "screw," there's only one title with "screw" in Exhibit 5 and it's Girls Who Screw Girls.

Would you agree with that, Dr. Hartmann?

A. **I'm not at that place on the spreadsheet.**

Q. Well, I'm just flipping through between Exhibit 5 and 6. And Exhibit 5 only has Girls Who Screw Girls with the title word "Screw" in it. Would you agree with that?

A. **Oh, hold on. Let me go back to that. I see that.**

Q. And there's, there's no other "screw," so it's not going to have what we saw as Screw My Husband Please, 1 through 5. Would you agree with that?

A. **Yes, it would appear as that, yes.**

Q. Okay. So we could say if Screw My Husband Please, 1 through 5, was not on Exhibit 5, then it's probably not on your valuation sheet. Is that correct?

A. **That would be likely.**

Q. Okay. And just so that we can double-check this, I've got in the search feature up here "screw," and we see Girls Who Screw Girls which we just saw on Exhibit 5. And we see Girls Who Screw Girls there, but we don't see Screw My Husband Please, 1 through 5.

Would you agree with that?

A. **That appears to be missing.**

Q. So there could be potentially, you know, we saw just five titles right now that weren't on the valuation sheet, but there could potentially be many more that were listed on Exhibit 6 but weren't listed on Exhibit 5. Is that correct?

A. **The valuation would be the same. That would be correct.**

Q. Okay, but the valuation sheet, the Excel sheet that I have up right now is missing whatever would be in Exhibit 6 but not in Exhibit 5. Is that correct?

A. **Potentially, yes.**

MR. GREENGARD: Okay. No further questions. Anne, do you have anything?

MS. VANDERBROEK: I don't think so.

MR. GREENGARD: Then I'm fine going off the record if you are.

MS. VANDERBROEK: Yes.

(At 3:00 p.m., the deposition concluded.)

CERTIFICATE

I certify that this transcript, consisting of 44 pages, is a complete, true, and correct record of the testimony of VICTORIA HARTMANN, Ph.D., held in this case on Thursday, January 28, 2021.

I also certify that prior to taking this deposition, VICTORIA HARTMANN, Ph.D., was duly sworn to tell the truth.

______________________________________
ARLENE M. WRIGHT, CSR-0034, RPR, FCRR
Notary Public, Kent County, Michigan
My commission expires: 2-18-26
Dated this 1st day of February, 2021