Deposition 2

David Werking Deposition

**Page 1**

```
              U.S. DISTRICT COURT
            WESTERN DISTRICT OF MICHIGAN
                 SOUTHERN DIVISION
_____
DAVID ELLIOT WERKING,
An Indiana Resident,        Case No. 1:19-cv-276
     Plaintiff,             Hon. Paul L. Maloney
v
BETH EILEEN WERKING, and
PAUL MICHAEL WERKING,
Michigan Residents,
     Defendants.
_____

      ZOOM DEPOSITION OF:   DAVID ELLIOT WERKING


DATE:      January 29, 2021
TIME:      10:05 a.m.
LOCATION:  1715 East Princeton Avenue
           Muncie, Indiana
REPORTER:  Lori J. Cope, RPR, CSR-4113
           Appearing remotely from Newaygo County, Michigan
```

**Page 2**

1  REMOTE APPEARANCES:
2
3  POWERS & GREENGARD LAW, PLLC
4  BY:  Miles L. Greengard (P76812)
5     The Carriage House
6     509 Franklin Avenue
7     Grand Haven, MI  49417-1400
8     (616) 350-8760
9     mgreengard@powersgreengard.com
10           Appearing on behalf of the Plaintiff
11
12 VANDERBROEK LAW PLLC
13 BY:  Anne M. VanderBroek (P81541)
14    17190 Van Wagoner Road
15    Spring Lake, MI  49456
16    (616) 607-7522
17    anne@vanderbroeklaw.com
18           Appearing on behalf of the Defendants

**Page 3**

```
                   I N D E X
WITNESS:                                  PAGE
DAVID ELLIOT WERKING
Examination by Ms. VanderBroek              5
Examination by Mr. Greengard               17
Re-Examination by Ms. VanderBroek          28


                  E X H I B I T S
NO.  PG.  IDENTIFICATION
1         1-1-18 Email String Re Dream
2         1-1-18 Email String Re Dream with Attachments
3         12-30-17 Email String Re Dream
4         1-1-18 Email String Re Dream
5         List
     (Exhibits 1 through 5 were marked digitally after the
     deposition)

     (Plaintiff's Exhibit 5 and Exhibit 6 to the Motion in
     Opposition were referenced and attached)
```

**Page 4**

```
                      January 29, 2021
                      Muncie, Indiana
                      10:05 a.m.
                           ***
```

THE REPORTER:  My name is Lori Cope, certified stenographic reporter and notary public in the State of Michigan.  This deposition is being held via videoconferencing equipment.

The witness and reporter are not in the same room.

The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.  Please indicate your agreement by stating your name and your agreement on the record and please announce anyone else in the room with you.

MR. GREENGARD:  Attorney Miles Greengard, and I am fine with that.  No one else in the room.

MS. VANDERBROEK:  Attorney Anne VanderBroek.  No one else in the room.  I'm fine with that.

THE REPORTER:  Mr. Werking, do you have anyone in the room with you?

MR. WERKING:  No, I have no one in the room, and I agree with that.

DAVID ELLIOT WERKING,
after having been remotely sworn,
was examined and testified as follows:

### Page 5

EXAMINATION

BY MS. VANDERBROEK:

**Q.** Okay. Mr. Werking, thank you for being with us here today. I can start with kind of summarizing where we -- how we got here. Now, you lived with your parents in Michigan until a domestic dispute made you leave. Correct?

**A.** I lived with my parents off and on. I moved in the -- I did a short stint with them at the beginning of the divorce, that would have been about -- from February until about -- I'm going to say around June I left, and then I came back after the divorce to live with them.

**Q.** Okay. When you left after the divorce, the most recent time that you have lived with them, when you left that time, it was because of a domestic dispute. Correct?

**A.** Yes, there was a -- there was a -- there was an altercation, a physical altercation, and I was requested by the police officers to leave --

**Q.** Okay.

**A.** -- for three days.

**Q.** And when you left that last time, you left the state, you moved to Indiana, and you left all of your stuff with your parents. Correct?

**A.** Well, after the three days I tried to get it back, but they wouldn't let me on the premises with my PODS or anything else, so I left the state, yes, after that.

### Page 6

**Q.** Now, at that time, because you left it with your parents, it was property that was being held by somebody else for you at that time. Now, do you currently have any property that is being held by anybody else for your benefit?

**A.** I have no property that is being held by anybody else for my benefit right now.

MR. GREENGARD: I'm not sure if the court reporter picked it up, but I am going to object to that on the basis of relevance.

BY MS. VANDERBROEK:

**Q.** Okay. Had you been warned about bringing pornography into the house before you moved in with your parents the last time?

**A.** I -- when I was under the age of 18 I remember borrowing a porn VHS from my friend Brent down the street, and they destroyed it, and they said a lot of things.

**Q.** Okay.

**A.** I'm not sure if that was one of them, but when I came back I made sure to have a verbal contract that my belongings would not be destroyed.

**Q.** I'm going to share my screen with proposed Exhibit 1. Can you see this? It's an Adobe document that looks like an email.

**A.** Uh-huh.

**Q.** Do you recognize that you sent emails to your father back and forth?

**A.** Yes, I sent -- I sent emails to my father.

### Page 7

**Q.** Okay.

MR. GREENGARD: Can we go off the record for a second? I want to chat with Anne about something.

THE WITNESS: Okay.

(Off the record 10:10 to 10:11 a.m.)

BY MS. VANDERBROEK:

**Q.** So this, this particular email, was a chain with your father as you can see. Hold on a second. How do I move this thing? You can see his email addressed to you on January 1st. Is that correct?

**A.** That's what it says. I'm not sure that that's right, but I have -- I'm not going to go check it right now.

**Q.** Okay. What I'm particularly looking at is this section where your father is talking about your past history with selling pornography, with him destroying that pornography that you talked about from high school. Do you recall those events?

**A.** Yes.

**Q.** And did you sell pornography in the past?

**A.** No.

**Q.** Why would your parents believe you had?

MR. GREENGARD: Objection, calls for speculation, and objection on relevance.

But you can still answer that, David.

**A.** Could you repeat the question?

BY MS. VANDERBROEK:

### Page 8

**Q.** In your opinion, why would you think that your parents believed you to be selling pornography?

**A.** Because they are trying to get away with stealing my possessions.

**Q.** This is back in high school that I'm talking about in particular. They are talking about you had a past of selling pornography when you were in high school.

**A.** I never sold pornography in high school. I bought a Playboy from a friend, but I didn't sell pornography.

**Q.** Okay. In these emails with your father your email address, I can find it here, is showing as omik2omik2@hotmail.com. Is that correct?

**A.** Yes.

**Q.** Is that your email address now?

**A.** That is my email address now.

**Q.** Would you say that is a fairly unique email address, or is that a fairly common email address?

MR. GREENGARD: Objection, calls for speculation.

BY MS. VANDERBROEK:

**Q.** Have you seen any other email addresses that are similar to your email address?

**A.** I -- I don't know.

**Q.** Where did you come up with the idea for that email address?

MR. GREENGARD: Objection, relevance.

BY MS. VANDERBROEK:

9

1  Q.  In your interrogatories you were asked whether you had any
2      knowledge of the site Hornbunny. Do you recall that?
3  A.  **Yes.**
4  Q.  And you answered that you had no such knowledge. Is that
5      correct?
6  A.  **That is correct.**
7  Q.  Okay. When we did a Google search of your email address it
8      came up with a site Hornbunny for that email address. Do you
9      have any idea why that would be?
10 A.  **I have no idea.**
11          MR. GREENGARD: Calls for relevance -- excuse me,
12     calls for speculation. My apologies.
13 BY MS. VANDERBROEK:
14 Q.  Do you have a relationship with the website Hornbunny?
15 A.  **I have never heard of them before.**
16 Q.  What about the websites that you reference in Exhibit 3 I'm
17     showing now, YouPorn or xHamster, do you have a relationship
18     with either of those sites?
19 A.  **I know they exist.**
20 Q.  Do you buy or sell pornography on those sites?
21 A.  **No.**
22 Q.  Moving on to Exhibit 2, again, an email between you and your
23     father January 1st. In this one you are talking about the
24     items that were destroyed. Do you recall emails around that
25     subject? Do you recall this particular email where you said

10

1      there is -- you gave him a general list of the movies and the
2      albums and said that there were about 500 filled DVRs [sic]
3      and CD-Rs in there?
4  A.  **I remember that, yes. That is incorrect though.**
5  Q.  How so?
6  A.  **At the time my wife, she had this thing, it's called Amazon**
7      Prime, and when you have Amazon Prime you can get free CDs and
8      movies on it. And I -- I would take the CDs and the DVDs and
9      I would put them on a disc so that I could watch them on the
10     TV. I wanted to watch it on the big screen TV.
11 Q.  So you would pirate them?
12 A.  **I didn't think of it as pirating it. I thought of as moving**
13     it from one place to another without a -- without a cable.
14 Q.  Had you purchased the rights to those movies and --
15 A.  **Well, Amazon does, and I had a bunch of -- I had a bunch of**
16     these (indicating). These are -- these are free minutes, and
17     you get them when you buy DVDs and VHSes, and you go to the
18     website and they give you the free minutes, and then you go
19     and get -- get the movies to download.
20 Q.  So you buy the rights to the movies at that time?
21 A.  **Well, I would assume if they are a company that is selling the**
22     movies that they are also giving you the rights to the -- just
23     like Amazon, I mean.
24 Q.  Well --
25 A.  **That's what I thought.**

11

1  Q.  What does the R designation in CD-R and DVD-R mean?
2  A.  **Recordable.**
3  Q.  Okay. So that means you can take content from one medium,
4      say, streaming, and download it onto these discs. Correct?
5  A.  **All -- so it wasn't -- some of those discs were free**
6      compilations, people would send me compilations also when I
7      made purchases, but I wasn't -- I wasn't streaming it. I
8      would go to the websites and I would click the down- -- I
9      would use the minutes to buy it to download it.
10 Q.  So you were actually buying the titles, to clarify --
11 A.  **Yeah.**
12 Q.  -- or you were paying to access them via streaming?
13 A.  **Well, there was only one way to do it, you know. It wasn't --**
14     I don't think they would sell it streaming if you could
15     download the stream. I'm not a tech person.
16 Q.  I'm not familiar with the pornographic world. Do these cards
17     give you access via streaming where you can watch, or do they
18     give you the rights to own the content?
19 A.  **They -- you use them and then they send you the link to the**
20     movie, and then you put the movie on the disc using the
21     software that I got for free on the internet.
22 Q.  So you're essentially getting content you didn't pay for.
23     Correct?
24 A.  **No, but -- but --**
25          MR. GREENGARD: Objection.

12

1  A.  **Promotionals. They gave it to me. They said you have these**
2      minutes for free.
3  BY MS. VANDERBROEK:
4  Q.  You have got 500 discs. It is a significant number of discs.
5      Is that a typical -- I mean, 500 discs --
6  A.  **I only burned about 100 of them. The 400, they were all**
7      compilations of like we want you to buy this, we are going to
8      send you a bunch of scenes from movies.
9  Q.  Moving on, you were requested to produce all of your receipts
10     for your purchases in the production request. Do you recall
11     that?
12 A.  **I sent all the -- yes, I recall that.**
13 Q.  You sent a few bank statements as -- in lieu of receipts.
14     Correct?
15 A.  **Well, they said they wanted all of the receipts, so I sent**
16     them every single piece of information I could.
17 Q.  Okay. Exhibit 4 I believe -- no, that is 3, that is 4 --
18     talks about a single receipt for upwards of $11,000. Do you
19     recall this?
20 A.  **Yeah.**
21 Q.  Where is this receipt?
22 A.  **That receipt is in D. Werking evidence. It's a big folder and**
23     it has -- oh, you mean on the -- I didn't -- I didn't buy that
24     with Chase. Chase is my new bank.
25 Q.  These are the responses to the production request you gave me.

13

1  A.  **Right, but there was a big file that I sent to the police**
2      officers that had all of the -- I can resend it to you if you
3      need it.
4  Q.  You were asked to produce all receipts. You did not produce
5      all receipts, so I am asking where they are.
6  A.  **I gave D. Werking evidence to Miles.**
7              MS. VANDERBROEK: Miles?
8              MR. GREENGARD: We can go off the record here and we
9      can chat about this.
10             (Off the record 10:22 to 10:26 a.m.)
11 BY MS. VANDERBROEK:
12 Q.  I will skip my next question then, which is about the
13     remainder of the receipts from Exhibit 6 that was in the
14     initial pleading.
15         In the interrogatories you were asked the name -- to
16     produce the names of publishers, producers, et cetera of the
17     titles so that Dr. Hartmann could better appraise them, and
18     you did not produce those. There was an objection on those.
19     I don't care about the ones that were able to be appraised,
20     but for the titles that were unable to be determined,
21     particularly because they were vague, I would like those. Do
22     you have the producer, title, actors, et cetera, for those
23     items?
24 A.  **All I have is my memory. We are -- we are years away from me**
25     being able to do that.

14

1  Q.  So, for example, the title -- VHS title Amateurs, there is no
2      producer listed, there is no year listed, there is no further
3      information than Amateurs, which was not --
4  A.  **That -- that's what was written on the disc, on the VHS copy.**
5      That -- so I wrote down the title of the movie as it was
6      written on the VHS itself.
7  Q.  Okay. Why did you create these lists?
8  A.  **I -- as someone with adult attention deficit disorder, I am**
9      always making lists of -- because I never know -- you know, I
10     want to be cognizant of the world around me. I have
11     distractibility issues. I forget, I know I forget things, and
12     it's a coping mechanism for me.
13 Q.  I'm not sure if Miles told you this, but when we talked to
14     Dr. Hartmann yesterday she spoke of custom-commissioned films
15     and that those were difficult to evaluate because of their
16     unique nature. Were there any custom-commissioned films in
17     your collection to your recollection?
18 A.  **No, I didn't make any -- I didn't have any custom films**
19     done.
20 Q.  Okay.
21 A.  **I saw that one was semi custom. I just bought it. It was in**
22     a box.
23 Q.  Okay. Are the lists that you created that Miles filed as
24     Plaintiff's Exhibits 5 and 6, receipt of property and list of
25     missing items, these are from the initial pleading, are those

15

1      exhaustive lists? Do those create every title in your
2      collection?
3  A.  **Those, I wrote down everything I could remember. I'm sure**
4      there is more movies. And, as I told Miles, there is more
5      stuff in the house that they destroyed, but I just can't
6      remember it. I didn't write it down. I -- I don't have that
7      evidence.
8  Q.  Well, you spoke of your divorce attorney having some of these
9      lists. When were these lists originally created, before or
10     after the destruction?
11 A.  **Oh, before. They were -- these lists were created during.**
12     When you get divorced you make a list of assets and debts, and
13     they really want to know what's in your house. So I had just
14     got kicked out, and they wanted it, it was fresh in my
15     memory.
16 Q.  And so you made this, these lists, by going through your
17     items, here is a video, here is the title, here is the video,
18     here is the title, et cetera?
19 A.  **I -- I was -- my -- my wife, she was nice, she gave me my**
20     journal back when I asked for my journal (indicating), because
21     I keep my journal around to write down my memories and stuff,
22     and it was already in there.
23 Q.  Okay. So there were a number of titles that were turned over
24     to the Ottawa County Sheriff's Department this past -- a year
25     ago fall, 2019 fall. A number of those titles were not

16

1      included in this Exhibit 5 and 6, specifically Mother Daughter
2      Exchange Club films, Naughty Amateur Home Videos, Mother Son
3      Secrets, Brother And Sister, Unnatural Sex, She Is Turning 18,
4      Violation of Trina Mitchell -- or Michaels, Turning Up
5      Teeners, Teen Babysitters. Would there be a reason that these
6      titles were not included in your Exhibits 5 and 6?
7  A.  **Some of those were compilations. I didn't pay attention to**
8      the compilations that people would send me. The porn
9      companies, they would make these compilations. I didn't pay
10     attention to the titles of that. You know, compilations, I
11     know you are not a porn person, but compilations get passed
12     around all of the time. There are really cheap to make. Lots
13     of people get annoyed by them. So the -- there were a few
14     that I had not remembered, and so I put those on the list then
15     when -- when they reminded me. Again, it's like -- for me,
16     memory is like if I touch it, I remember it, I can remember a
17     lot about it. But when I'm away from it, when it's not, you
18     know, in my everyday life, it's like, ooh, you know. I do,
19     you know, so that I really -- I really rely on the lists a
20     lot.
21 Q.  So if you rely on these lists, if these lists are as complete
22     as you can make them, yet these items were left off of them,
23     how do we know other stuff wasn't left off of them, or if
24     things were not added where maybe you wanted them but didn't
25     have them yet?

17

| | | |
|---|---|---|
| 1 | A. | I just did the best job I could. |
| 2 | Q. | Would you have put items that you -- that were your, quote, |
| 3 | | unquote, wish list on these, amongst these titles? |
| 4 | A. | No. |
| 5 | Q. | So it's your sworn testimony that every title on here you |
| 6 | | owned? |
| 7 | A. | Yes. |
| 8 | | MS. VANDERBROEK: Okay. That's all I have got for |
| 9 | | right now. |
| 10 | | You are muted, Miles. |
| 11 | | MR. GREENGARD: Thank you, Anne. |
| 12 | | EXAMINATION |
| 13 | | BY MR. GREENGARD: |
| 14 | Q. | David, so I want to ask a few questions, you said something |
| 15 | | was semi custom. What is semi custom? |
| 16 | A. | That's what the lady who was doing the appraisal said about |
| 17 | | Lesbian Piss Party. She said it was semi custom. And I don't |
| 18 | | know what it means, because I -- buying custom videos are |
| 19 | | not -- are not a thing in my world. That's -- that's new |
| 20 | | weird stuff. I am just buying the regular -- if it's $30 and |
| 21 | | it has got a box, a big box, and it has got a lady with a |
| 22 | | weird perm and nails and -- you know, and it looks like it's |
| 23 | | kind of cool, then I'm buying it. |
| 24 | Q. | Excuse me. Okay. Were you buying the pornography because you |
| 25 | | enjoyed watching it for its sexual nature, or did you buy the |

18

| | | |
|---|---|---|
| 1 | | pornography because you enjoyed the set design and the corny |
| 2 | | dialogue and, you know, the makeup, or was it a combination |
| 3 | | thereof? In the same way that some people enjoy watching bad |
| 4 | | movies, not because they think the movie is good, but because |
| 5 | | it's fun to watch bad movies? |
| 6 | | MS. VANDERBROEK: I am going to object on |
| 7 | | relevance. |
| 8 | | BY MR. GREENGARD: |
| 9 | Q. | Are you -- |
| 10 | A. | Yeah. Well, yeah, I think I bought it for a couple reasons. |
| 11 | | I -- I enjoy cheese. I don't think of it as cheese. I think |
| 12 | | cheese as an art form. Cheese is something you are doing |
| 13 | | deliberately to draw humor into a situation, but nothing is -- |
| 14 | | when -- when somebody is doing something -- hello -- |
| 15 | Q. | I hear you. You are good. |
| 16 | A. | Okay. When people are having an intimate expression of |
| 17 | | themselves, sometimes I feel like there is -- there is an |
| 18 | | honesty there that I find lacking in almost any kind of movie, |
| 19 | | and I find honesty lacking a lot in the world. And so I |
| 20 | | value -- I really value honesty, and I really value being able |
| 21 | | to be completely intimate and be completely -- you know, |
| 22 | | baring it all to the world. I mean, that's a powerful |
| 23 | | statement. Now, I would watch these things maybe once and |
| 24 | | then I would put them away because some day I know that a |
| 25 | | censor is coming to take it away. |

19

| | | |
|---|---|---|
| 1 | Q. | So you did not just enjoy -- you did not -- sorry. Let me |
| 2 | | rephrase that. |
| 3 | | You did not only purchase the majority of |
| 4 | | pornographic material for arousal purposes, you also viewed it |
| 5 | | as art. Is that correct? |
| 6 | A. | Yes. |
| 7 | Q. | Okay. So there was a -- there was a question about a VHS in |
| 8 | | particular that the only information you had was Amateurs. Do |
| 9 | | you remember that question? |
| 10 | A. | Yes, I do. |
| 11 | Q. | Approximately how many of the videos; videos, DVDs -- the |
| 12 | | titles, we will use that term. Approximately how many of the |
| 13 | | titles were you less than confident in the name of? |
| 14 | A. | I was always very confident in the name of the titles. |
| 15 | Q. | So Amateurs is the exception, not the rule, that you were -- |
| 16 | A. | Right. |
| 17 | Q. | Okay. Can you ballpark how many you weren't, you know, |
| 18 | | incredibly confident of the name? |
| 19 | A. | I was very -- I am very confident of all of the names that I |
| 20 | | put down. |
| 21 | Q. | Okay. There was discussion about the veracity of the lists |
| 22 | | that you added, and I want to -- I believe Ms. VanderBroek |
| 23 | | asked this, but I want to make sure that we get it down for |
| 24 | | the record. The exhibits, and I am going to share my screen, |
| 25 | | and this is always a |

20

| | | |
|---|---|---|
| 1 | | hold-your-breath-and-make-sure-I-don't-screw-it-up moment. |
| 2 | | This is Exhibit 6, a list of missing items, which have 500 VHS |
| 3 | | titles and about 1,500 DVD titles. And Exhibit 5, receipts of |
| 4 | | property, which has about 1,500. You are familiar with both |
| 5 | | of these exhibits. Is that correct? |
| 6 | A. | Yes. |
| 7 | Q. | You made these lists. Correct? |
| 8 | A. | Yes. |
| 9 | Q. | And is there anything on those two lists that you did not |
| 10 | | buy? |
| 11 | A. | No, I bought everything. |
| 12 | Q. | Is there anything on those two lists that you did not pay |
| 13 | | for? |
| 14 | A. | Well, I already listed the things as -- that were given to me |
| 15 | | as gifts. |
| 16 | Q. | Okay. And those, those were in responses to Ms. VanderBroek's |
| 17 | | interrogatories. Correct? |
| 18 | A. | Yeah. |
| 19 | Q. | Were there anything on there -- was there anything on there |
| 20 | | that you downloaded without paying for? |
| 21 | A. | Well, I already talked about the -- I mean, downloading |
| 22 | | without paying for? |
| 23 | Q. | Let me rephrase the question. Is there anything on there that |
| 24 | | you did not believe you had a legal right to obtain? |
| 25 | A. | No, I had legal rights. I believed that I had legal rights to |

**Page 21**

1  obtain everything on that list.
2  Q. Did you go to any torrenting sites like BitTorrent or The
3     Pirate Bay to download any of those titles?
4  A. **No, I didn't. I didn't go to torrent sites at all. I like**
5     **paying artists to do the job that they have been tasked by God**
6     **with.**
7  Q. And did you go to any peer-to-peer sites like Limewire, Kaaza,
8     Napster in its heyday? Did you go to anything like that to
9     download those materials?
10 A. **No. No, sir.**
11 Q. So the only things on those lists that you didn't pay for you
12    were given -- you were comped them because you had purchased
13    other things through the production house. Is that correct?
14 A. **That's correct.**
15 Q. Okay. There was some discussion yesterday, and I realize you
16    weren't here, about titles involving animals. Were there any
17    titles involving animals in your collection?
18 A. **Yeah, I bought some titles involving animals --**
19 Q. Was --
20 A. **-- just to see what it was about.**
21 Q. Approximately how many titles was that?
22 A. **Eight or ten.**
23 Q. So it was a very small portion of the collection?
24 A. **Yes.**
25 Q. And how did you purchase those?

**Page 22**

1  A. **I bought -- I had a punk magazine and it was in the -- in the**
2     **back of one my punk magazines. There was an ad for Goosebumps**
3     **Graphix, and it was -- I -- and I wrote to them. This would**
4     **be in the olden days. You write letters and you get catalogs.**
5     **So I wrote a letter, I got a catalog there, and then, later**
6     **on, I used a credit card on some website.**
7  Q. Okay. And you previously testified that you created Exhibit
8     5. This is Exhibit 5, what I have on my screen -- and let me
9     see if I can move this -- Exhibit 5 and Exhibit 6. You
10    created these two lists. Correct?
11 A. **Yes.**
12 Q. And what's the difference? What would you put in Exhibit 5
13    versus Exhibit 6? What is the difference between the two
14    lists?
15 A. **Scroll back to Exhibit 5, please. Receipts of property. And**
16    **Exhibit 6 would be what? List of missing items. So the**
17    **difference is list of missing items and receipts.**
18 Q. So let --
19 A. **There are some things I -- I know I don't have. The receipt**
20    **would be the letter to my lawyer, and this, knowing that I**
21    **have it. I had -- I kept all of the receipts, but those**
22    **receipts got destroyed by the defendants.**
23 Q. So if something is listed in Exhibit 5, it is also listed in
24    Exhibit 6. Is that correct?
25 A. **Yeah.**

**Page 23**

1  Q. But if it's listed in Exhibit 6, it's not necessarily listed
2     in Exhibit 5. Is that correct?
3  A. **Right.**
4  Q. So, and this is confusing, and Ms. VanderBroek and I had a
5     tough time working through this with the expert yesterday, so
6     I just want to say this again, and I realized that I just
7     asked it, but I want to make sure we get it down because we
8     are all on the same page because you are the one that created
9     these lists. Everything on Exhibit 5 is on Exhibit 6, but not
10    everything on Exhibit 6 is in Exhibit 5. So Exhibit 5 is a
11    smaller subset of Exhibit 6. Is that correct?
12 A. **Yes.**
13 Q. Okay. And did you purchase everything on Exhibit 6?
14 A. **I purchased it? Yes, I purchased everything on Exhibit 6.**
15 Q. And there is about 500 VHSes. Is that correct? I'm sorry,
16    there is about 400 -- 428 VHSes on Exhibit 6. Does that feel
17    about correct, about how big your collection was?
18 A. **Yeah.**
19 Q. And you paid for all 428 of those, those VHSes. Correct?
20 A. **Right.**
21 Q. And there are I think it is 1,602 -- 1,605 -- 1,605 DVDs on
22    Exhibit 6. Did you pay for all 1,605 of those DVDs?
23 A. **Yes, I paid for all of those.**
24 Q. So that is just over 2,000 items all together, and you paid
25    for all 2,000 items?

**Page 24**

1  A. **Uh-huh, yes.**
2  Q. And Ms. VanderBroek showed you --
3     MR. GREENGARD: And, Anne, if you want to point me
4     to which exhibit it was, it was about 500 DVDs and --
5     MS. VANDERBROEK: Yeah, that would have been Exhibit
6     2.
7  BY MR. GREENGARD:
8  Q. Let me bring that up. I stopped sharing my screen so you guys
9     don't see emails to other clients. An attorney did that on a
10    trial I was in, so I learned my lesson there.
11    Exhibit 2. Okay. David, I am showing you what
12    Ms. VanderBroek has previously marked as Exhibit 2. This was
13    an email to your father on January 1st of 2018. Do you
14    recognize this email?
15 A. **Yes, I do.**
16 Q. Okay. You talked about that a few minutes ago. And you
17    stated there were also about 500 -- excuse me, 500 filled
18    DVD-Rs and CD-Rs in there. And you typed that. Correct?
19 A. **Yeah.**
20 Q. Now, those 500 filled DVD-Rs and CD-Rs, are they listed in
21    Exhibit 6?
22 A. **I listed them down at the bottom under miscellaneous. I was**
23    **thinking of it as miscellaneous stuff. I didn't want to**
24    **charge my parents for anything that -- because these**
25    **compilations they give you, they are really, really cheap, and**

25

1   they are really -- you know, boy, they -- they sweat a lot,
2   you know, making those. They don't. I am just kidding. You
3   know, it's very silly, but they don't work very hard in making
4   them. Most of the time they don't work at all. But, you
5   know, I just -- I didn't want to charge them for it, but I
6   knew that, you know, if they sold them, they are worth
7   something, so I just said okay, well, let's charge them the
8   price for CD-Rs and DVD-Rs.
9  Q.  So those 500 filled CD-Rs and DVD-Rs do not make up any of the
10     2,000 VHSes and --
11 A.  **That's correct.**
12 Q.  Okay. And were any of the 2,000 VHSes or DVDs, so that 2,000
13     and change, were any of those recordable copies, or were they
14     all received from a production house?
15 A.  **Any -- any -- any DVD-Rs I bought were official DVD-Rs from**
16     the company. This is where it gets kind of tricky, because
17     Filmco at the time was going through, I know, a really bad
18     situation, and sometimes they would put things on DVD-Rs.
19     Now, that's not the way you should do things, but that's the
20     way that the company did things. So they would be officially
21     a DVD-R copy, but they are selling it as if it was a regular
22     DVD.
23 Q.  Okay.
24 A.  **So everything I bought was official and had the rights to it,**
25     just maybe not all on the right -- I mean, okay, to make -- to

26

1   print a regular DVD costs about $140. To make a DVD-R, not
2   very much money. So, again, companies are going out of
3   business. They were trying to make whatever buck they can. I
4   am just trying to keep it alive.
5  Q.  I'm sorry, I cut you off. You can keep answering that.
6  A.  **That's fine. I am kind of -- I'm kind of zoning out, but**
7     that's all right. That's me. It's -- it's the morning.
8  Q.  Well, I'm rounding third, so we are almost done. On the DVDs
9     that I am looking at, did most of these have copyright
10    protections on them such that you can't just throw it in a DVD
11    burner, or did most of these -- was it like buying a CD in
12    1995, that no one thought of that and you could put it in a
13    burner?
14 A.  **I never thought of that. I didn't have a DVD -- I mean, I**
15    didn't have a -- I mean, I had a DVD burner on my laptop then,
16    but I didn't think about burning actual DVDs and seeing if
17    they would translate onto a DVD-R. I already had the DVD
18    copy. I wasn't trying to make copies of anything. And I
19    just -- I didn't need it, so I didn't try to figure it out.
20 Q.  And were any of the 2,000 titles on Exhibit 6, were any of
21    those burned from a friend or a family member, or did you
22    purchase all 2,000 of those?
23 A.  **I purchased all of the movies, yeah.**
24 Q.  And then you testified that you would download things from
25    Amazon Prime or whatnot and then put them on -- burn them onto

27

1   a DVD so you could watch them on a TV. Is that correct?
2  A.  **Yeah.**
3  Q.  Did you ever sell those copies?
4  A.  **No, I just -- I just -- I never sold them. I just wanted to**
5     watch them on the TV. I figured I -- you know, eventually,
6     you know, I would get the money, when I would get the money I
7     would buy a copy, and -- because I want to support the
8     artists, but right then I didn't have a lot of money. It was
9     very tight. I was trying to save save save because I was kind
10    of worried about the economy then. I still am. But, no, I
11    never thought of -- I thought about get- -- you know, I
12    thought about them as kind of trash. It's kind of like the
13    debris of the world.
14 Q.  You had a legal right to watch those from an Amazon Prime
15    membership or a Netflix membership or whatever?
16 A.  **Yeah, I had the legal rights to. I mean, it was my wife's**
17    account, and I was -- but it's both our money, so I was
18    using -- you know, so I thought it -- and she said oh, you
19    used my account, you used my account, because I never used
20    Prime.
21 Q.  So on Exhibit 6 you estimated just about 29,000 you spent on,
22    money, and since then defendants have recovered a few boxes of
23    items. Do you stand by the most recent valuation, which is
24    just a shade under $25,000, in terms of out-of-pocket
25    expense?

28

1  A.  **Yeah.**
2  Q.  Okay. And you put together a replacement cost of $40,000,
3     which would trickle down to somewhere between 35 and 40 once
4     we account for those new materials -- or the rediscovered, the
5     found materials?
6  A.  **Yeah.**
7  Q.  Do you stand by that evaluation?
8  A.  **Yeah.**
9           MR. GREENGARD: Okay. No further questions.
10                    RE-EXAMINATION
11 BY MS. VANDERBROEK:
12 Q.  I have got a few more to follow up.
13          You mentioned some of the receipts in -- or proof
14    that were listed in Exhibit 6 were in a letter to your lawyer,
15    but that you didn't have the original receipt. What do you
16    mean when you say a letter to your lawyer?
17 A.  **I meant that my lawyer asked for this, for me to list**
18    everything that was in the house and divide it between you,
19    this is yours, this is your wife's, or this is both of yours.
20    So I made that list of assets and debts, and I put everything
21    on there because I didn't want her to go through and destroy
22    it all, because I know how women get when they are mad, so --
23    well, sometimes. I mean, you haven't seen my wife when she is
24    mad. Believe me. So I -- you know, I wanted -- that was the
25    list I made of -- of all of my stuff.

### 29

1  Q. And in that letter to your lawyer did you guesstimate the
2     value, as you did in Exhibit 5, or did you actually have
3     physical receipts or electronic receipts for those items?
4  A. Well, I remembered what I spent, and I remembered spending --
5     I -- it was a guesstimate, but it was a fairly accurate
6     guesstimate.
7  Q. But it wasn't based on actual receipts, it was based on your
8     recollection of such?
9  A. It was -- yeah, every time there is a receipt my mind sees the
10    receipt (indicating).
11 Q. So if I asked you -- every time you see a receipt your mind --
12    you said you see that receipt. So if I asked you --
13 A. Well, yeah, if I go to Wendy's, if I see a receipt, I would be
14    like wow, that is 6 bucks, or I will remember that, that chili
15    at Wendy's is, you know, 6 bucks. I will remember that.
16 Q. So if I asked you, because you said that you see that receipt,
17    on -- let me share my screen a second. If you are looking at
18    Exhibit 6 to your original filing, this first title, Head
19    Waitress, says PROOFLL after it.
20 A. Yeah.
21 Q. Your legend says that means it was in this letter to your
22    lawyer. So do you recall, what did the receipt say that the
23    value of Head Waitress was?
24 A. Well, I remember buying that from Excalibur Films, and I
25    remember that that was about 20 bucks.

### 30

1  Q. So you don't mentally recall that receipt, you recall
2     approximately what it was, but it's --
3  A. Yeah. That's a guesstimate, yeah.
4  Q. Okay. You mentioned -- you mentioned -- because some of these
5     that you burned after having downloaded them, did you back up
6     any of your films? Did you, you know, transfer some of the
7     VHSes to a DVD for storage purposes, or did you make any
8     electronic copies of the title, or store them in the cloud or
9     anything like that?
10 A. I don't -- I don't know anything about the cloud, ma'am. I
11    wasn't making any copies. If I liked the movie I made sure to
12    buy it. I -- to buy it when I saw it out.
13 Q. I'm not asking if you bought them or not. I'm asking if,
14    after you had bought the film, if you had transferred -- so
15    you remember when VHS made the transition to DVD?
16 A. Yes.
17 Q. And everybody was hot on the bandwagon of let's transfer
18    everything that was on VHS because it's a medium that
19    disintegrates, or a lossy medium, let's transfer all of our
20    home videos onto DVD. So there were services where you could
21    send your videos away.
22 A. No, I never did that, ma'am.
23 Q. Okay. You didn't keep any of those ones that you downloaded
24    and then later burned on a hard drive?
25 A. No.

### 31

1  Q. Okay. So none of the titles that you are listing you have any
2     access to at this point?
3  A. That's correct.
4  Q. And just for clarification I'm going to again share my screen
5     because I talked about titles that weren't on the list and
6     where I got those titles just so that you can see. This is
7     Exhibit 5 created by your father, and it's a catalog of the
8     titles that were submitted to the Ottawa County Sheriff's
9     Department, which I don't know if Miles has picked up yet or
10    not, but I simply did a copy paste from the Excel spreadsheet
11    that this exhibit was taken from to find out whether it was on
12    your list or not. I'm just explaining that's where I found --
13    where -- where you will see whether it is on Exhibit 6 or not.
14    So, for example, Mother Daughter Exchange Club, I highlight
15    that, and then I go to your Exhibit 6, which we have said is
16    the more complete list, and it shows it is not there. Do you
17    follow that?
18 A. I don't know why, why it wouldn't be there, ma'am.
19    MS. VANDERBROEK: Okay. I had already asked my
20    question about that, so I'm not going to ask it again. I just
21    realized I hadn't showed that exhibit, so I wanted to show my
22    work.
23    That is all of my questions.
24    MR. GREENGARD: I have no further.
25    So, Anne, unless you have got something, I think we

### 32

1  can go off.
2     MS. VANDERBROEK: I think so, yes.
3     THE REPORTER: Counsel, would you like to order
4  transcripts at this time?
5     MS. VANDERBROEK: Yeah, I would like a copy of the
6  transcript.
7     MR. GREENGARD: Yes.
8  (Whereupon this remote deposition was concluded at
9  11:12 a.m.)

```
                                                              33


  1                            CERTIFICATE
  2
  3    STATE OF MICHIGAN    )
  4                         )
  5    COUNTY OF KENT       )
  6
  7             I, LORI J. COPE, Certified Shorthand Reporter and
  8    Notary Public, do hereby certify that the foregoing matter was
  9    taken remotely before me.
 10             I FURTHER CERTIFY that this matter was taken in
 11    shorthand and thereafter transcribed by me and that it is a
 12    true and accurate transcript.
 13             IN WITNESS WHEREOF, I have hereunto set my hand this
 14    1st day of February, of 2021, at Fremont, Michigan.
 15
 16                         _____
 17                         LORI J. COPE, CSR-4113, RPR
 18                         Notary Public for Newaygo County
 19                         My Commission Expires:  3-25-2021
 20
 21
 22
 23
 24
 25
```